Sealed

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

UNITED STATES OF AMERICA, ex rel.,
AYLEE A. HALLAK,

**18-21120**

Case No.:

                Plaintiff/Relator,

v.

KINDRED HEALTHCARE, INC.; KINDRED
REHAB SERVICES, INC. d/b/a
REHABCARE; and PACIFIC 9TH STREET
APARTMENTS, INC. d/b/a CLARIDGE
HOUSE

                Defendants.

_____/

**CIV-MARTINEZ**

## COMPLAINT

On behalf of the United States of America, Aylee A. Hallak, Plaintiff/Relator ("Relator") files this qui tam complaint against Defendants Kindred Healthcare, Inc.; Kindred Rehab Services, Inc. d/b/a RehabCare; and Pacific 9th Street Apartments, Inc. d/b/a Claridge House, pursuant to 31 U.S.C. §3730, et. seq., as amended, to recover all damages, penalties, and other remedies available under the False Claims Act, and in support thereof alleges as follows:

### I.  INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.  This matter involves a significant ongoing fraud on the United States government through the systematic and willful disregard of Medicare rules and regulations.

2.  Defendants Kindred Healthcare, Inc.; Kindred Rehab Services, Inc. d/b/a RehabCare; and Pacific 9th Street Apartments, Inc. d/b/a Claridge (hereinafter referred to collectively as "Defendants"), which own and operate Skilled Nursing Facilities ("SNFs"), have created and implemented a scheme to defraud Medicare by billing for rehabilitation services that

are not medically necessary.

3.      Defendants are systematically falsifying patient medical records in order to bill Medicare for services that have not been provided or are not medically necessary.

4.      In 2016, Defendants RehabCare and Kindred entered into a $125 million settlement to resolve False Claims Act allegations that the companies billed Medicare for rehabilitation services that were not reasonable, necessary, or which never occurred.   Not surprisingly, in part because it is so profitable, and in part because it is so easy to get away with, Defendant continues to submit fraudulent billings to Medicare and pressure therapists to go along with their schemes to keep their jobs.

5.      Defendants' objectives of maximizing profit at any cost continued after this settlement, as have their wrongful practices. Medicare patients are kept on-services for as long as possible in order to continue Medicare payments to Defendants, regardless of medical need.

6.      In furtherance of Defendants' objective, employees are forced to record planned minutes of therapy rather than actual minutes of therapy, which resulted in inflated per-diem rates for patients. Additionally, Medicare patients were kept on-service longer than medically needed in order for Defendants to continue receiving Medicare dollars.

7.      Instead of making the required refunds to the federal government for these false claims, Defendants have enjoyed the benefits of their fraudulent conduct.  Defendants have in the past and continue to bill Medicare for ineligible home health care patients and for services that are unnecessary and, in fact, have not been provided in some instances.

## II.   PARTIES

### A. Relator

8.      Under the False Claims Act, a person or persons with knowledge of false or

fraudulent claims against the Government (a "relator") may bring an action on behalf of the federal government and themselves. Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B) and submits this statement and supporting materials in advance of filing a complaint.

9.      Aylee Hallak, DPT, is a resident of North Miami Beach, Florida. After earning her Bachelor's degree in Biology from Bethune Cookman College, Dr. Hallak then obtained advanced degrees from Nova Southeastern University to include a Masters of Physical Therapy and a Doctor of Physical Therapy. Dr. Hallak has been providing physical therapy services by evaluating patient care protocols, measuring outcomes, researching and evaluating emerging trends in physical therapy for 13 years.

10.      Dr. Hallak formed and started her own outpatient clinic in 2005 and serves as its owner/CEO. Hallak Inc. also provides rehabilitation service to Medicare Part B patients in her outpatient clinic. Dr. Hallak has worked in hospitals, nursing homes, physical therapy clinics and skilled nursing homes.

11.      Relator began employment with Defendants as a PRN[1] physical therapist in July 2014 and became a fulltime physical therapist in July 2015.

**B. Defendants**

12.      Kindred Healthcare, Inc.; Kindred Rehab Services, Inc. d/b/a RehabCare; and Pacific 9th Street Apartments, Inc. d/b/a Claridge House are registered to do business in the state of Florida.

13.      Kindred Healthcare, Inc. is a holding company; Kindred Rehab Services, Inc. d/b/a RehabCare is a wholly owned subsidiary of Kindred Healthcare, Inc. Under RehabCare, the companies provide contract rehabilitation services to include physical, occupational and

---

[1] PRN is short for "pro re nata" which generally refers to individuals who are hired "when necessary."

speech-language rehabilitation services in more than 1700 locations across 47 states, including Florida.

14.     In Florida, RehabCare provides contract therapy services across multiple settings including skilled nursing facilities (SNFs), assisted living facilities (ALFs), independent living facilities (ILFs), continuing care retirement communities (CCRCs) and outpatient facilities.

15.     RehabCare provided rehabilitation services to four facilities in South Florida that Relator was familiar with.  Relator has worked at the following two locations:

> a.  Claridge House (registered to do business in the state of Florida as Pacific 9th Street Apartments, Inc.)
> 13900 NE 3rd Ct.
> Miami, FL. 33161
>
> b.  Vi at Aventura
> 19333 W. Country Club Dr.
> Aventura, FL. 33180

16.     Defendants' employees, who are not named as defendants to this action, perpetrated fraud against the government at the direction of Defendants.  These employees likely did so under the impression that they would lose their employment or be transferred or otherwise affected negatively by their disagreement with Defendants' processes.

## C. JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. §3729.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345.

19.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2).

20.     This Court has personal jurisdiction over Defendants because as described herein

they transact business in the Southern District of Florida and because the acts complained of herein occurred in the Southern District of Florida.

21.     Venue is proper in the Southern District of Florida pursuant to 31 U.S.C. §3732(a) because Defendants transact business in the Southern District of Florida, and because the acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in the Southern District of Florida.

## III.   THE NATURE OF THE CASE

22.     In January, 2016, the Justice Department announced that contract therapy providers RehabCare Group Inc., RehabCare Group East Inc., and their parent, Kindred Healthcare Inc., had agreed to pay $125 million to resolve a government lawsuit alleging that they violated the False Claims Act by knowingly causing Skilled Nursing Facilities to submit false claims to Medicare for rehabilitation therapy services that were not reasonable, necessary and skilled, or that never occurred.

23.     The government's complaint which preceded the settlement alleged that RehabCare Group, Inc.'s policies and practices, including setting unrealistic financial goals and scheduling therapy to achieve the highest reimbursement level regardless of the clinical needs of its patients, resulted in RehabCare Group, Inc., providing unreasonable and unnecessary services to Medicare patients and led its SNF customers to submit artificially and improperly inflated bills to Medicare.[2]

24.     Rehabcare Care Group, Inc. and Defendant Kindred entered into a Corporate Integrity Agreement (CIA) on or about January 11, 2016 with the Office of Inspector General of the United States Department of Health and Human Services (OIG-HHS) to promote compliance with all statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal

---

[2] This matter is captioned United States ex rel. Halpin and Fahey v. Kindred Healthcare, Inc., et at., case number 1:11cv12139-RGS (D. Mass.).

health care programs.  The period of compliance required by Defendant under the CIA is five years, expiring on January 11, 2021.

25.     Based on Relator's personal experience working for Defendants, the practices previously investigated by the Justice Department continued after the settlement and continue to this day.

### A.     RELATOR'S EXPERIENCE AT CLARIDGE HOUSE

26.     During Relator's first week of employment for Defendant as a PRN physical therapist at the Claridge House, she was instructed to manipulate the start and finish times for therapy on the iPad she was issued by Defendant.  The iPad was used to begin and end each therapy session with a patient.  The Director of Rehab told Relator to ask the other therapists how to manipulate the device to maximize billing.

27.     Relator learned that the patient times in the iPad could be changed to insure that there were not multiple entries using the same time for a particular patient.  This was easily accomplished by the therapists at the end of their shift.  Prior to syncing up the iPad with Defendant's system, a therapist could adjust the patient times in order to avoid duplicating another therapist.

28.     It was during her first week at the Claridge House and later at the Vi at Aventura that Relator was told by the other therapists to go along with the demands of the Director of Rehab or risk being fired.  Relator was expected to be a "team player."  Relator was shocked to discover fraudulent activity was occurring on a daily basis at both the Claridge House and the Vi at Aventura.

29.     The following issues were prevalent in both locations:

  1. Patients were placed in the highest therapy reimbursement level with no consideration to the individualized evaluation

plan prepared by a therapist;

2.  Fraudulently reporting that skilled therapy minutes had been provided to a patient when in fact the patient was asleep, out of the facility or otherwise unable to undergo or benefit from skilled therapy;

3.  Fraudulently providing therapy services to Medicare Part B patients to increase revenue that were not based on the clinical needs of a patient; and

4.  Demanding that therapists achieve at least a 95 percent productivity rating without any consideration for the tolerance level of the patient.

30.      Each day, Relator and other therapists would receive a daily rehab schedule that would list the patient names, their type of insurance and the planned therapy minutes they were to perform for each patient.  The rehab schedule was at least three pages long and page one consisted of patients covered by Medicare Advantage plans, commonly referred to as Medicare Part C and/or HMOs.[3]  Page two was for Medicare Part A patients and page three was for Medicare Part B patients.

31.      The therapists were also provided with a blank Daily Interaction Form ("DIF") where they recorded patient names, the planned minutes of therapy, the minutes of therapy performed and the start and end time of rehabilitation services for each patient.  They would use the daily rehab schedule as a guide to ensure they were not recording a time that another therapist was using to see the patient.

32.      If done correctly, the therapist would begin services on a patient and record the start time of therapy on the iPad.  When they were done providing rehabilitation services, they would record the stop time in the iPad.  In reality, and in order to not conflict with other

---

[3] Medicare Advantage plans are private health insurance plans for individuals enrolled in Original Medicare, Part A and Part B. When you join a Medicare Advantage plan, you are still in the Medicare program and must continue paying your Part B premium.

therapists, therapists would manipulate the start and finish times in the iPad at the end of their shift to simply reflect the number of therapy minutes planned for the patient (rather than *actually provided to* the patient) to accomplish the highest Resource Utilization Group level and thus receive the highest amount of reimbursement available under Medicare Part A.

33.     The daily interaction form had a column named "Plan." This column contained the projected therapy minutes that Defendant had assigned for a particular patient. Defendant used the column, not as a guide or suggested amount of therapy, but rather, the minutes that were essentially required to be recorded by the therapist. Therapists were made to feel like there was no other option. The pressure exerted daily on each therapist to hit the exact number of minutes was overwhelming. It was impossible for Relator and other therapists to perform all of the mandated minutes for each patient.

34.     Relator was responsible for the other physical therapists and physical therapist assistants ("PTA"). As such, she had to perform evaluations, complete performance summaries, review all work performed by a PTA, and prepare daily notes and discharge summaries for patients. In addition, above and beyond this other work, Relator was expected to bill for nearly eight hours of therapy each day.

35.     Therapists, including Relator, were not allowed to deviate from the schedule even if patients could not tolerate the number of minutes planned. Defendant did not allow the therapist to record the **actual** amount of therapy minutes performed on a patient if it was less than the projected minutes.

36.     Relator witnessed patients who could not tolerate the amount of therapy minutes in the "Plan" column, often due to severe medical conditions like advanced dementia, simply being brought down to a gymnasium area where they were staged until the scheduled amount of

therapy minutes had passed.  They would then be taken back to their room.

37.     When therapists recommended to Defendant that the patient be discharged, Defendant kept the patient on just to bill additional days.  Therapists were required to record therapy minutes on patients even if they were asleep, out of the facility or unable to undergo or benefit from skilled therapy.  If they refused, they would be sent home prior to working their full shift.

**B.      REHABILITATION UNDER MEDICARE PARTS A AND B**

38.     Medicare is a federally-administered health insurance program primarily benefiting the elderly (individuals aged 65 and older who have worked in the social security or railroads systems).[4]  Medicare has several parts; Part A and Part B are relevant here.

39.     Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities ("SNFs") for Medicare patients who have been discharged from an inpatient hospital stay of at least three consecutive calendar days, home health care and hospice. 42 U.S.C. § 1395c-1395i-5.

40.     For a Medicare beneficiary to be eligible for SNF care under Medicare Part A, the beneficiary's physician must certify that daily skilled care is needed.  The federally regulated Prospective Payment System ("PPS") permits for the Center for Medicaid and Medicare Services ("CMS") to provide advance payments to SNFs for skilled nursing services to eligible patients. Medicare Part A covers and pays a pre-determined daily rate for each day of care up to 100 days, per benefit period, subject to co-payment obligations after the first 20 days which are billed separately to and paid by the resident, private insurance, or Medicaid.[5]

---

[4] Medicare also covers certain other beneficiaries, notably those younger than 65 afflicted with end-stage renal disease and those who qualify for the benefit due to a disability.
[5] A benefit period starts when a patient goes into the hospital and ends when the patient has not received any hospital care or skilled nursing care for 60 days.

41.     SNFs are reimbursed for services provided under the Medicare Part A program on the basis of a per-diem (or daily) rate.  While each patient's needs are unique, in order to facilitate fair and accurate reimbursement rates, CMS developed a patient classification system to group or typify the nature and extent of services needed by each patient.  These are referred to as Resource Utilization Groups ("RUGs").  While the RUGs system allows for categorical evaluations and ease of identifying reimbursement rates by patient type it is highly susceptible to fraud and abuse.

42.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.

43.     Medicare Part B many medical services provided to Medicare beneficiaries, including those residing in nursing homes.  These services include, but are not limited to, diagnostic laboratory tests, x rays, hospital outpatient services, ambulance services, rehabilitation services, the purchase and rental of durable medical equipment, orthotic/prosthetic devices, and surgical dressings.  Most Part B services provided to nursing home residents who are not in a Part A covered stay are not subject to consolidated billing requirements.  Rather, each service provider may submit a separate claim to Medicare for each service rendered.  Medicare pays for these Part B services using a fee schedule, which varies by locality.

44.     Normally, patients would be provided rehabilitation services under Medicare Part B based on doctor orders or if they were admitted to the facility after a hospital stay that did not qualify the patient for Medicare Part A.  Relator and the other therapists were pressured by the Defendants through the facilities' Director of Rehab to locate and provide rehabilitation services to long-term residents even if the services were not medically necessary.

45.    Specifically, the Director of Rehab instructed nurses to add orders for long-term patients so that Defendants could bill for rehabilitation services.  This required Relator to prepare an evaluation plan under Part A and she would be assigned the additional patients.  If Relator pushed back and told the Director of Rehab that she didn't have time to handle more patients, the Director of Rehab would threaten to send Relator home due to having a low case load.

### C.    DEFENDANTS' ABUSE OF THE MEDICARE SYSTEM

46.    As set forth above, Defendant prepared rehab schedules that were provided to each therapist daily.  The therapy minutes where predetermined by Defendant and therapists were expected to provide the amount listed.  At no point did Defendant rely on its therapists to determine how much therapy a patient was to receive.  Defendant's decisions on therapy minutes were not based on the clinical needs of a patient, but rather on billing goals and maximizing reimbursable revenue.

47.    Defendant demanded that therapists have productivity levels of 95 percent or higher.  This meant the company required each therapist to be conducting billable therapy at least 95 percent of time.  If therapists did not reach Defendant's pre-determined productivity level, the therapist could be terminated or reduced from a full time employee to a part time employee.  It was impossible for therapists to provide adequate rehabilitation therapy to what are often, sick, frail and medically compromised patients.

48.    Defendant never reduced therapy minutes to account for the transport of a patient, frequent breaks that would be required by the patient due to documented severely impaired tolerance levels, the preparation of detailed documentation that was required or personal breaks by the therapist, despite these activities being non-billable.

49.    In order to maintain the productivity level demanded by Defendant, therapists

were forced to see multiple patients at the same time, falsify the number of therapy minutes actually provided, or risk losing their jobs.  The rehabilitation minutes for each patient are predetermined by Defendant and are not based on the clinical need of the patient or in the initial evaluation performed by the therapist.  The following are just a few examples of a therapist's schedule that resulted in fraudulent billings to Medicare.  These predetermined schedules are fraudulent, possibly criminal and clearly done to maximize reimbursement to Defendant[6]:

i.       **Occupational Therapist Fariba Ghasemi**

50.      On June 1, 2017, OT Fariba Ghasemi's rehabilitation schedule required her to provide occupational therapy to nine patients that included four Medicare Part C patients; two Medicare Part A patients; and three Medicare Part B patients.  Based on the daily interaction form, her shift began at 7:05AM and her shift ended at 2:24PM.

| Medicare Payer | Patient Name | Plan Minutes | Start Time | End Time |
|---|---|---|---|---|
| C | Patient 1 | 34 | 7:02 | 7:36 |
| C | Patient 2 | 34 | 7:36 | 8:10 |
| C | Patient 3 | 34 | 7:36 | 8:10 |
| C | Patient 4 | 90 | 8:11 | 9:40 |
| A | Patient C [7] | 66 | 9:40 | 10:48 |
| A | Patient 5 | 38 | 10:48 | 11:26 |
| B | Patient 6 | 60 | 11:27 | 12:26 |
| B | Patient 7 | 60 | 11:26 | 1:25 |
| B | Patient 8 | 60 | 1:25 | 2:24 |
| **Total Minutes** | | **476** | | |

51.      OT Ghasemi was scheduled to perform 476 minutes of rehabilitation services during her shift.  According to the daily interaction form that was filled out by OT Ghasemi, she purportedly provided 474 minutes of therapy.  Based on the times listed, she was able to go from one patient to another seamlessly.  OT Ghasemi required extra time to reach the next patient on

---

[6] Documentation supporting these allegations has been provided to the government, but it omitted from this Complaint in the interest of protecting patient information and brevity.
[7] Additional information about how fraud was committed on Medicare using this patient is included below in the Patient Examples section of this Complaint.

only two occasions.  In both cases, this only took one minute.  OT Ghasemi's daily interaction form does not reflect any periods where a patient needed to rest or recover prior to continuing therapy.

52.     The two Medicare Part A patients seen by OT Ghasemi would have spent at least three days in a hospital prior to being admitted to the facility and would have some bad days or low energy days.  OT Ghasemi also provided rehabilitation therapy on three Medicare Part B patients.  These are generally long term care patients who require extra time in the facility in able to work on skills of daily living so that they can return to their homes.

53.     A review of rehab schedules provided to the government shows that nearly all Part B patients received the exact amount of minutes planned by Defendant.  Defendant's ability to achieve nearly the exact amount of planned minutes for all patients is questionable.  Forcing highly trained and educated therapists to falsify records of care for patients is unacceptable, the end result of which is outright fraud.

      **ii.**        **Occupational Therapist Shirah Klein**

54.     On August 24, 2017, COTA Shirah Klein's rehabilitation schedule required her to provide occupational therapy to nine patients to include two Medicare Part C patients; five Medicare Part A patients; and two Medicare Part B patients.  Based on the daily interaction form, her shift began at 8:36AM and her day ended at 3:45PM.

| Medicare Payer | Patient Name | Plan Minutes | Start Time | End Time |
|---|---|---|---|---|
| B | Patient 9 | 60 | 8:36 | 9:35 |
| B | Patient 10 | 60 | 9:36 | 10:37 |
| A OPTUM | Patient 11 | 30 | 10:39 | 11:09 |
| A | Patient 12 | 40 | 11:10 | 11:52 |
| A | Patient 13 | 60 | 11:54 | 12:55 |
| C | Patient 14 | 30 | 12:56 | 1:21 |
| A | Patient 15 | 61 | 1:22 | 2:20 |

| A | Patient A[8] | 55 | 2:21 | 3:13 |
|---|---|---|---|---|
| C | Patient 16 | 30 | 3:15 | 3:45 |
| **Total Minutes** | | **426** | | |

55.     COTA Klein was scheduled to perform 426 minutes of rehabilitation services during her shift. According to the daily interaction form, she purportedly performed 418 minutes of therapy. Based on the times listed, she was able to go from one patient to another seamlessly. During COTA Klein's entire shift, there were only 11 minutes where she was not providing any therapy. COTA Klein's daily interaction form does not reflect any periods where a patient needed to rest or recover prior to moving on. Medicare Part A patients, who must have spent at least three days in a hospital to receive rehabilitation therapy under Medicare Part A, would be expected to have some bad days or low energy days. Defendant's purported achievement of nearly the exact amount of planned minutes for a patient is questionable. Forcing highly trained and educated therapists to falsify records of care for patients is unacceptable.

**D.     PATIENT EXAMPLES OF FRAUDULENT MEDICARE BILLING**

56.     Relator witnessed numerous ways in which Defendant would manipulate therapy minutes which led to fraudulent billing to Medicare. The patient examples below are just a fraction of the fraud that is occurring. In many instances, the fraud is disguised as medically necessary services, when in reality; patients were not able to physically tolerate the amount of minutes assigned to them. In fact, employees were forced to record minutes for patient care that they never provided or risk losing their jobs.

57.     Defendant's desire to manipulate and falsify billing records has no limits. On many occasions, when Defendant realized that they had come up short on minutes in order to bill at the highest level, they merely went back into the records several days later and added

---

[8] Additional information about how fraud was committed on Medicare using this patient is included below in the Patient Examples section of this Complaint.

additional time.  Defendant's billing practices are reckless and totally at odds with their stated purpose of caring for patients.[9]

### i.    Medicare Patient A

58.    This Patient began treatment for physical and occupational therapy on or about July 15, 2017 at the Claridge House Nursing and Rehabilitation Center.  The Patient refused to get out of bed and participated in approximately 15 minutes of therapy a day.  The Patient suffered from chronic pain which restricted her ability to participate in therapy.  Still, the rehab schedules reflect that she was receiving between 58 to 112 minutes of therapy each session. Defendant knew that she was actually only receiving about 15 minutes of therapy a day.  Yet, because actual therapy minutes were not records and the rehab schedules were relied on as both the therapy minutes planned and provided, Defendants billed Medicare for the entire amount.

### ii.    Medicare Patient B (Medicare Part B Patient)

59.    As an example of the unnecessary use of Part A benefits for patients who were covered by Part B, this Patient was receiving therapy services from April 15, 2016 through May 26, 2016 at the Claridge House Nursing and Rehabilitation Center.  He was bed bound and non-responsive.  He made no progress during the entire time he was at the facility.  The Patient was being billed for 60 to 75 minutes of therapy each session.  The only therapy that was provided was passive therapy for approximately 10 to 15 minutes a session.  Therapist repeatedly requested that he be taken off of therapy services.  Defendant knew that he could not tolerate the planned amount of therapy minutes due to his medical condition.  However, Defendant forced the physical and occupational therapists to fraudulently record that the planned therapy minutes had been provided to him.

---

[9] Documentation supporting these allegations has been provided to the government, but has been omitted from this Complaint in the interest of protecting patient information and brevity.

### iii.    Medicare Patient C

60.     Patient was receiving physical and occupational therapy from approximately June 1, 2017 through June 21, 2017 at the Claridge House Nursing and Rehabilitation Center.  The Patient had severe dementia and was not able to follow directions.  Therapists would regularly bring her to the gymnasium where she was left sitting until she was returned to her room.  The rehab schedules reflect that she received between 124 to 136 minutes of therapy for 14 days in June 2017.  Defendant knew that she could not tolerate this amount of therapy and was not receiving the planned minutes.  However, Defendant forced the physical and occupational therapists to fraudulently record that the planned therapy minutes had been provided to her.

### iv.    Medicare Patient D

61.     Patient was receiving physical and occupational therapy from approximately June 20, 2017 through August 16, 2017 at the Claridge House Nursing and Rehabilitation Center.  The Patient had severe dementia and was not able to follow directions.  Therapists would regularly bring her to the gymnasium where she was left sitting until she was returned to her room.  The rehab schedules reflect that she received between 96 to 180 minutes of therapy for 33 days during the above period of time.  Defendant knew that she could not tolerate this amount of therapy and was not receiving the planned minutes.  However, Defendant forced the physical and occupational therapists to fraudulently record that the planned therapy minutes had been provided to her.

### v.    Medicare Patient E

62.     The Patient was receiving therapy services during two time periods at the Claridge House Nursing and Rehabilitation Center.  The Patient had received Medicare Part A services from August 5, 2016 through September 2, 2016 and again from September 15, 2016

through November 23, 2016.  The Patient had a CVA (stroke), was extremely depressed and had COPD.  She did not want to participate in therapy.  At best, the Patient could tolerate 15 minutes of therapy a day.  Relator recalled that Medicare was billed for nearly one hour of therapy to this patient each therapy session.  Defendant knew that she could not tolerate the planned amount of therapy minutes due to her medical condition.  However, Defendant forced the physical and occupational therapists to fraudulently record that the planned therapy minutes had been provided to her.

     **vi.**    **Medicare Patient F**

     63.    The Patient was receiving therapy services from February 15, 2016 through May 25, 2016 at the Claridge House Nursing and Rehabilitation Center.  The Patient was 92 years old and had no tolerance for functional activities.  The Patient became confused very easily and was unable to follow directions.  The Patient could tolerate about 15 minutes of therapy but Medicare was being billed for 45 to 60 minutes each therapy session. Relator and other therapists requested that she been discontinued from therapy services.  The Director of Rehab finally discharged the Patient from occupational therapy as she neared her 100th day of Medicare Part A coverage. Defendant knew that she could not tolerate the planned amount of therapy minutes due to her medical condition.  However, Defendant forced the physical and occupational therapists to fraudulently record that the planned therapy minutes had been provided to the Patient.The above allegations are reflective of a scheme which has been perfected by Defendants and in which the government has previously taken affirmative action to recover from.

**IV.**    **Damages to the Government**

     64.    Upon information and belief, Defendants used the schemes explained and exemplified above to submit bills to the government that were fraudulent and based on the

provision of therapy minutes that were not in fact provided. Defendants created a documentation process that supported their scheme by preventing any therapist from recording actual therapy minutes provided and instead used the planned therapy minutes in order to recover the highest amount possible from Medicare.

## A. The False Claims Act

65.     The FCA, as amended, provide in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person.

U.S.C. § 3729(a)(1).

66.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B). Claims Processing Procedures under the Medicare Program

## B. Fraudulent Document in Support of Scheme

67.     In order to get paid under Medicare Part A, a provider completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 or as a CMS-1450 form. These forms or their

electronic equivalent contain patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the UB-4/CMS-1450 to determine whether and what amounts a provider is owed.

68.     A key purpose of the UB-04/CMS-1450 is to protect the federal government from loss due to mistake or fraud.  The Medicare billing system relies substantially on the good faith of providers to prepare and file accurate claims.

69.     To this end, the UB-04/CMS-1450 form contains the following warning:

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil and monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).  Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

70.     In order to get paid from Medicare for Part A claims, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS-1450/UB-04.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS-1450/UB-04 to determine whether and what amounts the provider is owed.

71.     That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by

[name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

72.     To this end, the Health Insurance Claim Form, CMS 1450, contains the following certification by the physician or supplier submitting a claim to Medicare:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

73.     That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## C. Conditions of Participation and Conditions of Payment

74.     To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement includes certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

## D. Medical Necessity and Appropriateness Requirements

75.     One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.   42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

76.     Various claims forms, including the Health Insurance Claim Form, require that

the provider certify that the medical care or service rendered was medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.  See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

77.     The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### E.   Obligation to Refund Overpayments

78.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement.  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

79.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

### F.  Quality Reporting Program

80.     Another important requirement for a provider that wishes to participate in the

Medicare Program is a mandatory quality reporting program (QRP) that was established by Congress for long-term care hospitals, skilled nursing facilities, home health agencies and inpatient rehabilitation facilities. The Improving Medicare Post-Acute Care Transformation act of 2014 (commonly known as the Impact Act) established a quality reporting program for SNFs. The Impact Act was established to support CMS quality strategies to include improving the overall quality of care, providing support in communities to deliver higher-quality care and to reduce the cost of quality healthcare for individuals, families, employers and government. Non-compliance in reporting could result in a reduced payment rate for the SNF.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

81.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 81.

82.    By and through the fraudulent schemes described herein, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

83.    Specifically, Defendants, through fraud and manipulation, systematically falsified the number of therapy minutes provided to a patient, and created plans for patients to receive Medicare Part A- covered rehabilitation therapy when the same was not medically necessary.

84.    Upon information and belief, Defendants billed for minutes of therapy spent taking rest periods and breaks or transporting the patients in order to reach the highest number of minutes needed to bill at the highest level possible.

85.    The length of time for rehabilitation services that Defendants forced on patients

was unreasonable and for the sole purpose of furthering their scheme to receive maximum compensation for services.

86.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States through Medicare, Tricare or other government insurance programs for such false or fraudulent claims.

## SECOND CAUSE OF ACTION
### Making or Using False Record or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

87.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 81.

88.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

89.     Inherent in their scheme was the provision of false documentation to the government representing that a certain number of therapy minutes were provided to a patient when that was, in fact, false.

90.     Defendants knowingly made or used false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

    (a) false claims for therapy services that were never performed;

    (b) false records indicating an amount of therapy minutes were completed when those therapy minutes were not completed, or included unbillable time such as rest periods; and

    (c) false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

91.     By virtue of the false records or statements Defendants made or used, the United

States Government paid claims it otherwise would not have or should not have and has suffered substantial monetary damages.

92.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States through Medicare, Tricare or other government insurance programs for such false or fraudulent claims.

**WHEREFORE**, Relator, on behalf of the United States of America, demands judgment against the Defendants, ordering that:

a)  Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b)  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c)  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and,

d)  Relator be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY IS HEREBY REQUESTED**

Dated this 23rd day of March, 2018.

Respectfully submitted,

BY: _____

James D. Young (FBN 567307)
jyoung@forthepeople.com
(904)361-0012 Telephone
Sarah A. Foster (FBN 115462)
sarahfoster@forthepeople.com
(904)361-4442 Telephone
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)366-7677 Fax

Larry P. Zoglin (FBN 87313)
lzoglin@phillipsandcohen.com
**Phillips & Cohen LLP**
100 The Embarcadero Suite 300
San Francisco, CA 94105
(415)624-1103 Telephone
(415)836-9001 Facsimile

*Attorneys for Plaintiff/Relator*